## COSTANZO COAL MINING CO. v. WEIRTON STEEL CO.

### No. 222.

District Court, N. D. West Virginia.

Jan. 6, 1945.

George A. Blackford, of Wheeling, W. Va., and Gordon D. Kinder, of Martins Ferry, Ohio, for plaintiff.

Carl G. Bachmann, of Wheeling, W. Va., and John E. Laughlin, Jr. and Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., for defendant.

BAKER, District Judge.

This action is brought by Costanzo Coal Mining Company, hereinafter referred to

as the "plaintiff," which is and, at all times hereinafter mentioned, was a corporation, organized and existing under the laws of the State of West Virginia, with its principal office and place of business at Wheeling, West Virginia, against Weirton Steel Company, hereinafter referred to as the "defendant," which is and, at all times hereinafter mentioned, was a corporation organized and existing under the laws of the State of West Virginia, with its principal office and place of business at Weirton, West Virginia.

All facts herein have been stipulated. A brief recital of the same may, however, be of some benefit.

Upon March 20, 1933, the plaintiff and the defendant entered into a written agreement, whereby the plaintiff agreed to sell and the defendant agreed to buy slack coal to an amount which should represent 90% of the defendant's requirements for such coal, at prices to be agreed upon from time to time. The defendant was given an option to renew the agreement for two-year periods. This the defendant did in 1934, 1936, 1938 and 1940. These renewals were evidenced by letters written by the defendant to the plaintiff, notifying the plaintiff of the intention to renew the contract, and by letters from the plaintiff to the defendant accepting such renewals.

The original contract of sale specified that it was for slack coal to be produced at plaintiff's Richland Mine (which is located in Wheeling, West Virginia) and was to be delivered by river barge to the defendant's plant at Weirton. Later the contract was modified by mutual consent and instead of coal from the Richland Mine, delivered by barge, there was substituted coal from mines operated by the Wheeling Valley Coal Corporation and Cove Hill Coal Company, and delivered by truck to the defendant's plant at Weirton.

The Wheeling Valley Coal Corporation and Cove Hill Coal Company will be hereinafter referred to as the "producers."

All of the coal involved in this action came from the producers' mines. Prior to the shipments of coal involved in this action, the plaintiff entered into written agreements with the producers, whereby the plaintiff was constituted exclusive sales agent for the producers, with the right to sell all coal mined and produced by them. The plaintiff had the right to make contracts binding upon the producers, but guaranteed payment for all coal sold. For this the plaintiff received a compensation mutually agreed upon between it and the producers.

On March 21, 1941, the plaintiff orally notified the defendant that deliveries of coal after that date would be made at minimum prices promulgated by the Bituminous Coal Code and not at the price agreed upon in the contract between the plaintiff and defendant. The defendant, on the same day, orally replied that deliveries should be made at the contract price or not at all. This oral notice and oral reply were both confirmed by letters from the plaintiff and defendant respectively.

From October 1, 1940, to March 23, 1941, the plaintiff caused to be delivered to the defendant, from the mines of the producers, 150,430.8 tons of coal. The plaintiff invoiced the defendant for this coal at the price which had been agreed upon by the plaintiff and defendant, and the defendant remitted to the plaintiff the invoiced amounts which the plaintiff, after deducting its commissions, in turn remitted to the producers. The plaintiff now claims that it is entitled to recover from the defendant the difference between the minimum code price for the coal and the price agreed upon and actually paid. This amounts to $176,116.24, together with interest, which at the time the action was instiuted, that is, August 21, 1943, amounted to $22,647.-59, or a total of $198,763.83.

The defendant seasonably filed its answer, alleging several distinct grounds of defense. However, only two need be here considered. The first ground of defense put forth is that this is an action on a contract brought by a citizen of West Virginia against another citizen of West Virginia, and that, hence, there is no jurisdiction in the Federal Court to entertain this cause. The second ground of defense considered is that even conceding, for the purpose of argument, that this Court has jurisdiction, the proper parties plaintiff would be the producers of the coal and not the plaintiff, who was merely sales agent for such producers.

Let us first consider the question of jurisdiction. The plaintiff contends, first of all, that this is an action arising under the laws of the United States, and, as such, is properly in this tribunal. The plaintiff cites numerous cases seeking to support this contention, and I do not deem it necessary to here review all such citations. The question of what constitutes a case arising under the laws of the United States is not always of easy determination. Earlier

cases, dealing with this subject, adopted rather a broad view, holding that any question involving a Federal question should be cognizable in the Federal Courts; however, this would appear to be no longer the law. An excellent discussion of this matter is found in the opinion of Mr. Justice Cardozo in Gully v. First National Bank in Meridian, 1936, 299 U.S. 109, 57 S.Ct. 96, 97, 81 L.Ed. 70:

"How and when a case arises 'under the Constitution or laws of the United States' has been much considered in the books. Some tests are well established. To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. Starin v. [City of] New York, 115 U.S. 248, 257, 6 S.Ct. 28, 29 L.Ed. 388; First National Bank v. Williams, 252 U.S. 504, 512, 40 S.Ct. 372, 374, 64 L.Ed. 690. The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another.

"* * * Partly under the influence of statutes disclosing a new legislative policy, partly under the influence of more liberal decisions, the probable course of the trial, the real substance of the controversy, has taken on a new significance. 'A suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of such a law upon the determination of which the result depends.' Shulthis v. McDougal, 225 U.S. 561, 569, 32 S.Ct. 704, 706, 56 L.Ed. 1205. Cf. First National Bank v. Williams, supra; Hopkins v. Walker, 244 U.S. 486, 489, 37 S.Ct. 711, 61 L.Ed. 1270; Shoshone Mining Co. v. Rutter, 177 U.S. 505, 507, 20 S.Ct. 726, 44 L.Ed. 864. Only recently we said after full consideration that the doctrine of the charter cases was to be treated as exceptional, though within their special field there was no thought to disturb them. Puerto Rico v. Russell & Co., supra [288 U.S. 476, 53 S.Ct. 447, 77 L.Ed. 903]. 'We should fly in the face of this legislative policy and disregard precedents which we think controlling were we to extend the doctrine now.' Id. Today, even more clearly than in the past, 'the federal nature of the right to be established is decisive— not the source of the authority to establish it.' Id.

"* * * The most one can say is that a question of federal law is lurking in the background, just as farther in the background there lurks a question of constitutional law, the question of state power in our federal form of government. A dispute so doubtful and conjectural, so far removed from plain necessity, is unavailing to extinguish the jurisdiction of the states."

Two cases strongly relied upon by the plaintiff; namely, Downey v. Geary-Wright Tobacco Co., D.C., 39 F.Supp. 33, and Carter v. Bramlett, D.C., 51 F.Supp. 547, are both decisions by District Courts and, while I am not in any sense criticizing the learned Judges writing these opinions, I must of necessity give greater weight to a pronouncement by the Supreme Court of the United States. In addition to this, I feel that the Downey v. Geary-Wright Tobacco Co. case is distinguishable from the present proceeding in that it was based entirely upon a right created by Federal statute, whereas, the instant case is based fundamentally upon a contract entered into between the plaintiff and defendant.

Counsel also lay great stress upon the line of cases holding that under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., a carrier, who has charged a shipper less than the approved schedule of tariffs, can recover from the shipper the amount of the shortage. I do not feel that the interstate commerce cases are applicable here. The Interstate Commerce Act applies to all carriers and to all shippers. No carrier can operate except in accordance with the terms of the Act, and no shipper can avail himself of the services of any carrier, except in accordance with the provisions of the Act. The Bituminous Coal Act, 15 U.S.C.A. § 828 et seq., on the contrary, is not in its terms applicable to all producers of coal and, so far as I can discover, is not in any way applicable to any buyer of coal. The Act imposed what, it is true, amounts to a confiscatory tax upon all coal producers, and then exempted from the tax those producers who voluntarily became members of the so-called Bituminous Coal Code. However, the membership in the Code was voluntary and any producer who wished to pay the tax could remain outside the Code and sell his coal for anything he pleased or for anything he could get. It appears at once that this makes a radically different situa-

tion from that arising under the Interstate Commerce Act.

The plaintiff herein seeks to make the Bituminous Coal Act applicable to purchasers of coal, as well as to producers, and relies strongly upon the case of Kanawha and Hocking Coal & Coke Co. v. United States, decided in the Court of Claims, February 7, 1944. I have not been furnished and have been unable to find any citation for this decision, but have read and considered an official printed copy thereof. It suffices to say here that in the Kanawha and Hocking Coal & Coke Co. case, the Court based its decision upon the fact that the contract there being considered recited upon its face that if coal Code prices applied to sales to the United States, then the price provided for in the contract should be modified to meet the prices of the Bituminous Coal Code. The only way in which this case touched upon the question of the Act's applicability to a purchaser was that it was held that a producer, who was a member of the Code, was bound by Code regulations in sales to the Government, just as he would be bound in sales to private individuals. It did not, in any sense, hold that the purchaser, whether the Government or private citizen, was controlled in any way by the Code.

■ The legislative history of the Bituminous Coal Act clearly indicates that it is meant to apply only to producers of coal and not to purchasers. After the Act had passed the House an amendment was inserted in the Senate providing: "Any person, firm or corporation or other entity who shall knowingly purchase coal from any code member in such manner that the sale of such coal constitutes a violation of the code on the part of such code member shall be deemed guilty of a misdemeanor and upon conviction thereof shall suffer a fine not exceeding $1 for each ton of coal so purchased."

Another Senate amendment provided: "Any contract made on or subsequent to said date (June 16, 1933) which provides for a price below such established minimum price shall be unenforceable as to such price provision."

Both these amendments were eliminated by the Conference Committee of the House and Senate. This provides conclusive evidence that Congress did not intend to penalize the buyer for the seller's violation of the Code, and did not intend to make the Act apply in any way to a purchaser of coal as distinguished from a producer.

■ For these reasons I feel that jurisdiction can not be sustained upon the ground that this is an action arising under the laws of the United States.

■ Plaintiff also asserted, as a ground of Federal jurisdiction, that this was a suit involving interstate commerce. It contends that because the coal sold herein was used to produce iron and steel, a substantial part of which eventually went into interstate commerce, that the sale of the coal itself constitutes such commerce. This coal was produced at a mine in West Virginia, only a few miles distant from the defendant's mills, which were also in West Virginia. In traveling from the mines to the mills, the trucks never left West Virginia. The contract of purchase was made in West Virginia. The coal was paid for in West Virginia. I do not see how this can possibly be considered interstate commerce. It is true that the Bituminous Coal Commission, after hearing, made a ruling that all bituminous coal produced in West Virginia so affected the market for that portion of such coal as was shipped in interstate commerce that the entire production of the State mines should be treated as interstate commerce. Of course, this ruling could not be binding upon the defendant in this case since the defendant was not and, in fact, could not have been a party to the proceedings at which this ruling was promulgated; however, that ruling was made solely for the purpose of determining which mines producing bituminous coal in West Virginia properly came within the provisions of the National Bituminous Coal Act. If we are to hold that this coal, which never left West Virginia, was, in fact, in interstate commerce, then the mine props used in the mine in which the coal was produced would be in interstate commerce. The saws, with which these props were cut, would be in interstate commerce. The storekeeper, who sold the saws, would be engaged in interstate commerce. In fact, to carry this line of reasoning to its logical conclusion, there would be no possible human activity, in connection with the coal business, which would not be considered a part of interstate commerce, and every dispute involving coal, however remotely, would be cognizable in Federal Courts. I can not believe that that is the law.

I, therefore, hold, as a matter of law, that there is no Federal jurisdiction in this case and, for this reason alone, the action must be dismissed.

I feel, however, that the other defense, namely, that conceding jurisdiction, the producers would be the proper parties plaintiff, deserves some brief consideration.

It is stipulated that the plaintiff here was merely a sales agent or broker for the producers of the coal. Counsel for plaintiff cite Meechem on Agency, American Jurisprudence, and Corpus Juris Secundum, as authority for the proposition that an agent may sue on a contract made in his own name. Where a contract is made in the name of an agent, and he has pledged his personal liability to the other party to the contract, the principle of mutuality requires that the other person should be liable to the contracting agent. This is unquestionably the law, and if the defendant herein had refused or failed to pay for the coal delivered, the plaintiff would undoubtedly have been entitled to bring this action for the contract price of the coal. Here, however, the plaintiff is suing, not on the contract, but in derogation of the contract. The plaintiff has received everything it was entitled to in this transaction under the contract. If any one was injured, it was the producers of the coal and, even if Federal jurisdiction existed, the producers would be the proper parties to bring any proper action.

To sum up briefly, I do not feel that the Bituminous Coal Code has any application to a buyer of bituminous coal. If the plaintiff contends that this Code created an implied contract between the plaintiff and the defendant to pay Code prices, then the action is upon such implied contract and there is no Federal jurisdiction.

I hereby make the following formal Findings of Fact and Conclusions of Law. The numbers in parentheses refer to the number of the paragraph of the Agreed Statement of Facts upon which each finding is based.

### Findings of Fact

1. The plaintiff, Costanzo Coal Mining Company (referred to herein as the "plaintiff"), was, at all of the times hereinafter mentioned, and is a corporation organized and existing under the laws of the State of West Virginia (Par. I, Agreed Statement of Facts).

2. The defendant, Weirton Steel Company (referred to herein as the "defendant"), was, at all of the times hereinafter mentioned, and is, a corporation organized and existing under the laws of the State of West Virginia (Par. II).

3. Wheeling Valley Coal Corporation and Cove Hill Coal Company (referred to herein as the "producers") were corporations engaged in the business of mining coal. Both producers accepted memberships in the Bituminous Coal Code (promulgated pursuant to the Bituminous Coal Act of 1937, Chap. 17, Title 15, U.S.C.A.) and were members of such Code throughout the period of the shipments of coal hereinafter referred to (Par. IV).

4. Prior to the shipments of coal hereinafter referred to, the plaintiff entered into written agreements with the producers, copies of which appear in the Agreed Statement of Facts in this action, in paragraphs XII and XIII. These agreements recited, among other things, that the plaintiff was constituted exclusive sales agent for the producers, with the right to sell all coal mined and produced by the producers, that the plaintiff could make contracts binding upon the producers, that the plaintiff was to receive a mutually agreed upon compensation and that the plaintiff was to guarantee all accounts. In all of the transactions between the plaintiff and the defendant, hereinafter described, the parties understood that the plaintiff was acting pursuant to these agreements (Par. XIV).

5. On March 20, 1933, the plaintiff and the defendant entered into a written agreement, a copy of which appears in the Agreed Statement of Facts in paragraph VIII. This agreement recited, among other things, that the plaintiff would supply the defendant with 90% of its requirements of "slack" coal, at prices to be agreed upon from time to time, and that the defendant would have the option to renew the agreement. The defendant, in 1934, 1936, 1938 and 1940, addressed letters to the plaintiff, in which it stated that it was exercising its option to renew the agreement for another two-year period and the plaintiff addressed letters to the defendant accepting the renewals. Copies of these letters appear in the Agreed Statement of Facts in paragraph VIII. The last renewal extended the agreement for two years from April 1, 1940.

6. During the period from October 1, 1940, to March 23, 1941, the plaintiff caused

to be delivered to the defendant, from the mines of the producers, 150,430.8 tons of coal. The plaintiff invoiced the defendant for such quantities of coal at the price which the plaintiff and defendant had agreed upon pursuant to the agreement and renewal letters hereinbefore described, and the defendant remitted to the plaintiff the invoiced amounts which the plaintiff, after deducting its commissions, in turn remitted to the producers (Par. VII).

7. On March 21, 1941, the plaintiff orally notified the defendant that deliveries of coal after that date would be made at minimum prices promulgated by the Bituminous Coal Division under the Bituminous Coal Code, to which the defendant, on the same date, orally replied that deliveries should be made at the agreed price or not at all (Par. X). The plaintiff invoiced the defendant at such minimum prices for deliveries made on March 22 and 23, 1941, but the defendant actually paid only the agreed price. This oral notice and oral reply were later confirmed by letters from plaintiff and defendant.

### Conclusions of law

1. In its transactions with the defendant with respect to the deliveries of coal involved in this action, the plaintiff acted as agent for the producers of the coal.

2. Since this is not an action on the agreement between the plaintiff and the defendant, but a suit to recover prices higher than those stated in the agreement, the plaintiff, being merely an agent for the producers of the coal, can not sue in its own name.

3. Neither the Bituminous Coal Act of 1937, nor the Bituminous Coal Code, apply to a buyer of bituminous coal, who is not a member of the Code.

4. The Bituminous Coal Code was merely an agreement among producers and distributors of coal to conform to minimum prices promulgated by the Bituminous Coal Division, administrator of the Code, and to observe certain trade practices. The Code applied only to persons who voluntarily accepted membership in it and violations of the Code were not made violations of the Act.

5. The agreement between the plaintiff and the defendant, with respect to the price at which the deliveries of coal involved in this action were made, was a valid agreement and the defendant paid to the plaintiff the full amount of the agreed price for such deliveries of coal.

6. Even if the plaintiff and the producers of the coal violated the Bituminous Coal Code by making the deliveries of coal involved in this action at the agreed price, the plaintiff was the wrongdoer and can not now recover from the defendant the difference between the agreed price and the Code prices.

7. Neither the Bituminous Coal Act of 1937, nor the Bituminous Coal Code, gives the seller of coal any right of action against a buyer of coal who is not a member of the Code.

8. If this be regarded as an action on an implied contract, based upon the plaintiff's agreement, in accepting a distributor's permit under the Bituminous Coal Code, that it would not sell or distribute coal at less than Code prices, a District Court of the United States does not have jurisdiction of the action, the plaintiff and the defendant being citizens of the same State.

9. Judgment should be entered for the defendant.